# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### KANSAS CITY DIVISION

| | |
|---|---|
| **EDWARD ZACHARY KORTE and STEVEN RAY, individually and on behalf of all others similarly situated,** | |
| ***Plaintiffs*,** | **Case No.**   4:25-cv-736 |
| **v.** | **CLASS ACTION COMPLAINT** |
| **CBD AMERICAN SHAMAN, LLC; STEPHEN VINCENT SANDERS, II; SVS ENTERPRISES, LLC; SHAMAN BOTANICALS, AND JOHN DOES, 1-10;** | **JURY TRIAL DEMANDED** |
| ***Defendants*** | |

Plaintiffs Edward Zachary Korte and Steven Ray (collectively "Plaintiffs"), individually and on behalf of others similarly situated, bring this Class Action Complaint against Defendants CBD American Shaman, LLC ("American Shaman"); Stephen Vincent Sanders, II ("Sanders"); SVS Enterprises, LLC ("SVS"); Shaman Botanicals LLC ("Shaman Botanicals"), and John Does, 1-10 (collectively "Defendants"). Plaintiffs' allegations are based upon personal knowledge as to their own actions and observations and are based upon investigation of counsel, information and belief as to all other matters.

# I. INTRODUCTION

1.     While cities, states, counties and the American public still work to recover from an entrenched opioid epidemic, a new threat has emerged due in no small part to Defendant Stephen Vincent Sanders II and his group of American Shaman businesses and associates.

2.     This case is about Sanders and others using the CBD American Shaman enterprise as a vessel through which they have carried out a scheme to defraud the public and consumers to reap enormous profits by fraudulently selling highly addictive, dangerous, opioid-like drug products that have, until very recently, flown below the radar of federal regulators.

3.     The products at issue contain a substance generally called 7OH, a reference to its key ingredient 7-hydroxymitragynine, an alkaloid found in trace amounts in the kratom plant native to Southeast Asia.  7OH has been found to strongly interact with the opioid receptors in the human body, and thus, when consumed in large quantities, it produces strong, opioid-like effects, which include effects that feel positive initially, like euphoria, pain relief, and relaxation, but which also include negative effects of dependence, addiction, and extremely painful and uncomfortable symptoms when the body starts to enter withdrawal.

4.     Plaintiffs contend that Sanders and his American Shaman enterprise worked together to purposely develop and create, through a process of chemical

manipulation, a highly potent, concentrated form of 7OH[1] – unlike anything found naturally in the kratom plant. They then used this potent 7OH concentrate as the key input and ingredient in a number of consumable products, including Advanced Alkaloids chewable tablets, which they have sold at high prices both through their CBD American Shaman retail stores spread around the country, and also at wholesale under "white label" or other brand names to other retailers.

5.     Defendants consistently misrepresent and omit material facts to purchasers about the true nature, character, and composition of their 7OH products to induce people to try them. They downplay their risks and their known addictiveness. Defendants also have knowingly sought to deceptively compare their highly addictive and potent 7OH products to kratom products, when the two are not comparable, in order to induce people who have previously used and are familiar with kratom products to try the 7OH products.

6.     Finally, Defendants have consistently represented, both expressly and implicitly, that their 7OH products are "legal" to be openly sold through retail stores,

---

[1] Some products at issue contain, or also contain, another named ingredient called Mitragynine Pseudoindoxyl ("M-P"), which is also described as a "derivative" of the kratom plant, and, upon information and belief, is also a highly addictive concentrate that has been similarly manufactured by certain Defendants for the same purpose as 7OH. For purposes of completeness, any references in this Complaint to 7OH are intended to also include and refer to M-P.

3

which further deceives and lulls customers into trusting that the products are ultimately safe to use, when they are neither legally approved for sale, nor safe.

7.     While federal and state regulators are just starting to take notice and investigate Sanders and his enterprise, there are already victims of this scheme: individuals who were deceived and induced by Defendants into trying and purchasing the products. Many first-time users or purchasers soon find themselves with a dependence or addiction that produces intense and painful withdrawal symptoms, for which they are then willing to repeatedly spend hundreds of dollars a month or more on more of the products to try to alleviate. Even purchasers who manage to avoid dependence or addiction are still being deceived by not knowing the truth of what they are buying, and by paying a premium for these products based on misrepresentations and concealment of material facts about the true nature of the products.

8.     Despite Sanders and his partners lobbying and arguing the "benefits" of 7OH, which they say are its positive effects for users and a lower propensity for overdose deaths compared to opioids like fentanyl and heroin, their advocacy begs the question: if 7OH products are so great, why not tell the world, and especially purchasers, the full truth about them? Defendants have chosen deceit over transparency and have built enormous wealth as a result by creating a growing market for these highly addictive products.

## II. PARTIES

### A. Plaintiffs

9.     Plaintiff Edward Zachary Korte is a resident and citizen of Overland Park, Johnson County, Kansas.

10.     Plaintiff Korte has purchased Advanced Alkaloids from CBD American Shaman retail stores located within the state of Kansas.  All of Plaintiff Korte's purchases were made in retail stores; no purchases were made online.

11.     Plaintiff Korte began purchasing Advanced Alkaloids in approximately April of 2025, seeking the advertised benefits of pain relief and feelings of positivity.

12.     Neither the packaging, labeling, or information from store employees accurately described to Plaintiff Korte the addictive and habit-forming nature of the product or the severity of pain and discomfort of withdrawal symptoms that quickly arose from use of the product.  Store employees downplayed the addictiveness of the Advanced Alkaloids products and downplayed the severity of the effects of withdrawal upon reducing or ceasing use of the products.

13.     Plaintiff initially used the product as directed but quickly found it necessary to take more of the product than directed in order to fight off the pain and discomfort of withdrawal symptoms associated with the product.

14.     Plaintiff purchased approximately 20 bottles, each containing 30 tablets, of Advanced Alkaloids, priced at $99.99, for a total of approximately $2,000 in a four-month period.

15.     Plaintiff Steven Ray is a resident and citizen of Kansas City, Platte County, Missouri.

16.     Plaintiff Ray has purchased Advanced Alkaloids from CBD American Shaman retail stores located within the state of Missouri. All of Plaintiff Ray's purchases were made in retail stores; no purchases were made online.

17.     Plaintiff Ray was first given a free sample of Advanced Alkaloids by a CBD American Shaman store employee in late 2024 with encouragement to try it and with no disclosure or information about the product being potentially habit forming or highly addictive. Plaintiff Ray disclosed to the employee that he was concerned about habit forming or addictive products; the employee said the store was told by the manufacturer that Advanced Alkaloids were safe.

18.     Plaintiff Ray started buying Advanced Alkaloids on a regular basis in February of 2025, seeking the advertised benefit of pain relief.

19.     Neither the packaging, labeling, or information from store employees accurately described to Plaintiff Ray the addictive and habit-forming nature of the product or the severity of pain and discomfort of withdrawal symptoms that quickly arose from use of the product.

20.     Plaintiff Ray initially used the product as directed but quickly found it necessary to take more of the product than directed in order to fight off the pain and discomfort of withdrawal symptoms associated with the product.  He was advised

by a store employee to try a different vein of Advanced Alkaloids, and he did, but the withdrawal symptoms only got worse.

21.     Plaintiff purchased numerous 2-packs priced at $9.99 and numerous 30-tablet bottles priced at $99.99, spending thousands of dollars on Advanced Alkaloids over a several month period in 2025.

**B. Defendants**

22.     Defendant CBD American Shaman, LLC ("CBD American Shaman") is a Missouri limited liability company with its principal place of business in Kansas City, Missouri.  CBD American Shaman, owns and operates, or, serves as franchisor for approximately 140 retail stores spread among 23 states, including 19 stores in Kansas and 16 stores in Missouri.

23.     Defendant Stephen Vincent Sanders, II ("Sanders") is, upon information and belief, the President, CEO, and principal owner of CBD American Shaman, LLC, SVS, Shaman Botanicals, LLC, and other affiliated entities.  He is a resident and citizen of Jackson County, Missouri.

24.     Defendant SVS Enterprises, LLC ("SVS") is a Missouri limited liability company with its principal place of business in Kansas City, Missouri.  SVS is, upon information and belief, the parent company of CBD American Shaman, and is affiliated with other related entities owned and controlled by Sanders.  SVS, upon

7

information and belief, directly benefits from and knowingly participates in the scheme alleged herein as the parent entity of CBD American Shaman.

25. Defendant Shaman Botanicals, LLC ("Shaman Botanicals") is a Missouri limited liability company with its principal place of business in Kansas City, Missouri. Shaman Botanicals is, upon information and belief, the manufacturing entity of Advanced Alkaloids and other 7OH containing products, and, in conjunction with Sanders and others, researched, tested, and developed the concentrated 7OH ingredient used in Advanced Alkaloids and other 7OH containing products that are sold at retail through CBD American Shaman stores, and sold at wholesale to other retail stores that, in turn, sell the products to their retail customers. Shaman Botanicals was sent (along with Sanders) a Warning Letter from the Food and Drug Administration ("FDA") on June 25, 2025, alleging that Sanders and Shaman Botanicals' introduction of 7OH containing products into interstate commerce violates the Federal Food, Drug, and Cosmetic Act and "rases serious safety concerns."[2]

26. Defendants John Does 1-10 are as yet unidentified persons or entities who also, directly or indirectly, participated and assisted in the research, development, manufacturing, distribution, marketing, and sale of Advanced

---

[2] FDA Warning Letter, Shaman Botanicals, LLC, MRCS S-MBS 709622 – June 25, 2025; https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/shaman-botanicals-llc-709622-06252025

Alkaloids and other 7OH containing products that are sold at retail through CBD American Shaman stores, and sold at wholesale to other retail stores who, in turn, sell the products to their retail customers.

### III. JURISDICTION & VENUE

27.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs bring a claim that arises under the laws of the United States.

28.    This Court also has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 members of the proposed class nationwide; and the aggregate amount in controversy exceeds $5,000,000.

29.    Defendants are each subject to the general jurisdiction of this Court and personal jurisdiction in this district because they reside here and have substantial aggregate contacts both in Missouri and throughout a large number of the United States. All have materially participated in conduct that had intended and foreseeable effects on Plaintiffs and class members in each state in which Defendants have conducted business, such that courts in each of those states could exercise personal jurisdiction over Defendants. Defendants' conduct was purposefully directed at Plaintiffs and class members in Missouri and throughout many of the United States.

30.    Venue is proper in this district under 28 U.S.C § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in and/or emanated from this district, and because at least one Plaintiff and numerous potential Class Members reside in this district, and Defendants are residents of this district and transact business in this district.

## IV. FACTUAL ALLEGATIONS

### A. 7OH Compared to Kratom

31.    Kratom is the common name of *mitragyna speciosa*, a tropical plant or tree in the coffee family (Rubiaceae) which is native to Southeast Asia and is grown primarily in Indonesia, Malaysia, and Thailand.

32.    Kratom also refers to the substance derived from the leaves of the kratom plant, which, when ingested, can produce a range of psychoactive effects depending on the dose and mode of ingestion.

33.    The documented use of kratom in Southeast Asia goes back at least 150 years, where laborers would chew fresh leaves for a stimulant effect, or brew the leaves into a tea for an analgesic and relaxing effect.

34.    While kratom has its proponents, its dangers have long been known in Southeast Asia. Thailand banned all use, consumption, imports and exports of kratom in 1943, and only recently decriminalized it as part of reforms to address

prison overcrowding. Malaysia banned kratom in 1952 under its Poisons Act and it remains banned there today.

35. In the United States, kratom products have been sold for a number of years in smoke shops, gas stations, herbal stores, and "head" shops, typically marketed as an herbal remedy or supplement, promoted as offering a variety of potential benefits to users including mood enhancement, relaxation, pain relief, and a "high" feeling similar to that experienced by many from traditional opioids such as heroin, morphine, hydrocodone, or fentanyl.

36. Kratom products marketed and sold in the United States are often named or associated with a "strain" associated with the coloring of the veins of the particular kratom leaves used (.e.g,, red, green, or white). It is typical in the marketing of such products to relate different strains to distinct, psychoactive effects. For example, red kratom strains are often marketed as calming, whereas "white vein" or "green vein" kratom strains are said to be stimulating and energizing.

37. Creating consumable kratom products typically starts with drying and crushing harvested kratom leaves into a fine powder, which can be packaged and sold in pouches, tablets, capsules, or in liquid form (sometimes called an "extract shot").

38. The chemicals in the kratom plant that produce psychoactive effects are called "alkaloids." Alkaloids are a broad class of naturally occurring organic

11

compounds that contain at least one nitrogen atom. The function of alkaloids in plants is not fully understood, but many alkaloids have significant physiological effects on humans. Examples of well-known alkaloids include morphine, ephedrine, nicotine, and caffeine. (Alkaloid names generally end in the suffix "-ine" in reference to their chemical structure and classification as amines.)

39.    Although the kratom plant is known to contain dozens of different alkaloids, the ones primarily known to be responsible for kratom's psychoactive effects on humans are mitragynine ("MG") and 7-hydroxymitragynine ("7OH").

40.    MG and 7OH have been found to interact with several different receptors in the brain, including the alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), which are believed to lead to kratom's mood-lifting and stimulant effects.

41.    But even more significantly, MG and 7OH are known to interact with the mu-opioid receptor, which produces addictive and habit-forming effects, including euphoria and analgesia. The mu-opioid receptor has been described as "the gateway to addiction" because it is the receptor through which all opioids interact to produce euphoria, sedation, and pain relief. Thus, kratom has been referred to as a "quasi-opiate" by some health professionals because of how closely it mimics opioids. Indeed, kratom's effects are similar to opioids, it has been used

to alleviate opioid withdrawal symptoms, and, repeated use of kratom has been known to cause opioid withdrawal symptoms.

42.     While both alkaloids contribute to psychoactive effects, MG and 7OH are different in their prevalence and potencies in raw kratom.  MG is more prevalent, representing as much as 66 percent of the alkaloid content in kratom, while 7OH generally makes up only 1%-2% of raw kratom powder by weight.  However, studies have shown 7OH to be much more potent, as much as 10 to even 40 times more potent than morphine (and MG) in reacting with the mu-opioid receptor.

43.     The potency of the 7OH alkaloid has led to the recent development, within the past two years, of a relatively new class of mostly unregulated products that are produced by extracting the 7OH alkaloid from raw kratom, and then synthesizing and concentrating the 7OH alkaloid into a new, more concentrated and more potent extract.

44.     The 7OH-concentrated products differ significantly from products made from general raw kratom extracts.  With significantly increased amounts of the 7OH alkaloid, such products are stronger, more potent, more addictive, and lead to much more severe symptoms of withdrawal than ordinary kratom products.  Moreover, because they are unregulated, the dosages and quantities of 7OH contained in these concentrated products can vary significantly, and there is little to

13

no control or standardization in manufacturing processes or labeling to provide consistency or confidence in the accuracy of what any given product contains.

45. 7OH produces addiction and withdrawal symptoms just like opioids, as it is, essentially, an opioid, or is perceived by the human body as such. Withdrawal symptoms commonly associated with 7OH include irritability, anxiety, depression, muscle and bone pain, difficulty sleeping, difficulty concentrating, restless legs, muscle spasms, diarrhea, decreased appetite, chills, body temperature fluctuations, dysphoria and malaise.

46. 7OH users are often persuaded to start taking 7OH based on how good they are told it will make them feel. Once they start taking it, however, two things happen very quickly: they develop tolerance to the 7OH and need increasing doses to achieve the same feelings that the user is seeking, and, when the user stops taking 7OH, they experience withdrawal symptoms within a matter of hours. Worse, the withdrawal symptoms are far worse and more intolerable than whatever the user's baseline level of comfort or lack thereof was before they started taking 7OH.

47. Consequently, many users become addicted to 7OH quite quickly, and they continue to buy and use more and more 7OH products not because they are seeking a pleasurable feeling, but because they are trying to medicate themselves to stave off their withdrawal symptoms and to avoid feeling horrible. This cycle of use, withdrawal, and use causes many users to quickly spend ever-increasing

amounts of money on 7OH concentrated products because they cannot break their cycle of dependence or addiction.

48.     The FDA has only recently begun to catch up to 7OH concentrated products, but the regulatory tides are shifting.  On June 25, 2025, the FDA sent a warning letter to Shaman Botanicals, LLC, concerning its "7OH" Advanced Alkaloids chewable tablets (green vein and white vein), warning Shaman Botanicals that its introduction and delivery of these products into interstate commerce violates the Federal, Food, Drug, and Cosmetic Act.  The FDA's warning letter noted that the FDA "has observed a proliferation of products containing 7OH, and has serious concerns about [such products], [which] include the following: 1) 7OH products have not been evaluated by the FDA for safe use; 2) FDA has received adverse event reports associated with 7OH containing products; and 3) 7OH has been reported to have opioid-like effects."

## B. Sanders and the CBD American Shaman Enterprise

49.     Sanders founded CBD American Shaman in 2015.

50.     Originally, and still today, CBD American Shaman stores sell products that contain CBD.[3]  CBD American Shaman stores typically claim to offer the

---

[3] "CBD" refers to cannabidiol, the second most prevalent active ingredient in cannabis (marijuana).  Unlike tetrahydrocannabinal (THC), the principal psychoactive constituent of cannabis, CBD does not cause a "high" by itself. According to the World Health Organization, CBD exhibits no effects indicative of any abuse or dependence potential." CBD is and its use, alone, is unlikely to

15

"highest quality" CBD products, made from high-quality industrial hemp, including CBD oil tinctures, CBD capsules, CBD topicals, CBD edibles, and more.

51.     While most states and the federal government made the possession and distribution of THC-containing cannabis products illegal as of 2015, there were little to no prohibitions or restrictions on the distribution and possession of CBD products.

52.     Within its first few years of existence, the CBD American Shaman business grew to as many as nearly 400 retail stores nationwide, some of them company owned and operated, and others independently owned franchises.   In addition to selling CBD products, CBD American Shaman stores were sometimes known as a place where purchasers might also be able to buy products that contained THC-like ingredients, or, even THC products not labeled as such.   Thus, during the time when THC was largely not legal for open, public sale, CBD American Shaman stores offered people who were interested in THC or products resembling it a brick-and-mortar retail store offering some semblance of legitimacy (as opposed to an independent drug dealer) where they might find products to their liking.

53.     In 2015, only two states in the United States (Colorado and Washington) allowed recreational sales of THC-containing cannabis products.   The

---

significantly impair daily functioning or workplace performance.  There is evidence that CBD is effective in treating certain childhood epilepsy syndromes, and it is considered by some to help with anxiety, insomnia, chronic pain, inflammation, arthritis, and it may help lessen cravings for other addictive substances.

16

next seven years, however, brought a steady trend toward marijuana legalization at the state level. On December 8, 2022, Missouri became the 20th state to legalize recreational cannabis sales to some degree. Currently, that list stands at 24 states.

54. The problem for CBD American Shaman was clear: in a large and increasing number of states in which CBD American Shaman stores were located, including Missouri, the legalization of recreational THC products spawned a whole wave of new investment and new openings of retail stores – licensed dispensaries. These dispensaries competed directly with CBD American Shaman, because they could legally sell both THC-containing products (which CBD American Shaman could not legally sell) and CBD products as well.

55. Sanders knew that because of his prior felony and incarceration for illegal drug distribution, he or any entity owned by him would not be granted a license by the State of Missouri or any other state to lawfully dispense THC-containing cannabis products. He either did not apply for, or, did not receive, such a license.

56. CBD American Shaman stores struggled in the face of new competition and many closed their doors. Today, CBD American Shaman is down to approximately 140 stores, including both company owned and franchised locations.

57. It was sometime in 2021 or 2022, with his business spiraling, that Sanders claims to have made a new discovery about a new miracle product – a drug,

to be sure, but one that he could not call or admit was a "drug" *per se* without inviting and necessitating federal regulatory approval in order to legally market and sell. Sanders was completely comfortable with the semantics of making and selling products designed to stay out of regulatory crosshairs for as long as possible.

58.     Sanders did not discover 7OH, but he started to learn about its properties and characteristics, and he liked what he was learning.  He quickly realized that 7OH could be marketed as an opioid replacement, or even opioid withdrawal treatment, to a population that included a lot of people already experienced with opioid use. Soon, Sanders was spending considerable time with other business partners and associates researching and developing ways to manufacture a highly concentrated form of 7OH that could be used as a key, active ingredient in various products, like chewable tablets that he eventually named Advanced Alkaloids.

59.     Sanders already had an infrastructure in place to create, test, and manufacture new 7-OH containing products. He had manufacturing entities, Shaman Botanicals and American Shaman Manufacturing, Inc., which owned or operated laboratory facilities and employed some individuals of varying qualifications who were described internally as chemists.

60.     Thus, seeing an opportunity to salvage his CBD American Shaman business by pivoting to the attractive economics of addiction, Sanders and his

18

associates started learning how to manufacture and sell unscheduled, largely unregulated, highly addictive, opioid-like products containing his specially manufactured and concentrated form of 7OH.

## C. The 7OH Scheme to Defraud

61.     Sanders introduced the first Advanced Alkaloids products in CBD American Shaman stores or online in or around April of 2024, and at least by June 15, 2024.

62.     For many months prior to introduction, Sanders, Shaman Botanicals, and others researched and developed how to manufacture products that would contain much higher concentrations of 7OH than what occur naturally in the kratom plant and would thus be much more potent – and more addictive – than other kratom-based products on the market.

63.     Sanders has sought to conceal his manufacturing processes and the ingredients he uses to make his 7OH products through nondisclosure agreements he has required employees to sign and by choosing not to disclose such details publicly. That stands in contrast to Sanders' promotional videos he and his companies have posted on YouTube explaining and showing their processes for making CBD hemp oil products.

64.     Upon information and belief, after Sanders began producing prototypes of his 7OH concentrate and prior to releasing any Advanced Alkaloids products to

sell publicly, he "tested" his concentrate by offering free samples to employees and others, some of whom developed addictions to the raw 7OH materials they were provided.

65.     Sanders and associates, including employees of Shaman Botanicals, knew that the 7OH concentrate and Advanced Alkaloids that contained the 7OH concentrate were highly addictive and highly potent when they started selling them.

66.     Sanders performed no clinical trials for safety or effectiveness of his 7OH products and sought no regulatory approval to market through the Food and Drug Association.

67.     When Sanders and his associates introduced their first Advanced Alkaloids product for sale through CBD American Shaman retail stores and online, they fraudulently and deceptively described and marketed the products in several ways.

68.     First, there was no detailed explanation on product packaging about the contents, ingredients, or possible side effects of using the product.  That concealed material information from purchasers and consumers about the risks of dependence, addiction, and withdrawal symptoms from using the product.

69.     Second, the information about Advanced Alkaloids on CBD American Shaman's promotional website as of June 15, 2024, after the product was first introduced, advertised "no hangovers, enhanced feelings, and awareness the next

day." That statement was false and was intended to downplay the negative effects of withdrawal and dependence. Sanders and Shaman Botanicals knew that the products carried a significant risk of dependence and withdrawal symptoms which users could feel "the next day."

70. Third, in the "Legal and Safety Information" section of the promotional website for Advanced Alkaloids as of June 15, 2024, Sanders and Shaman Botanicals directed that the following language be used: "Advanced Alkaloids aim to lessen the plant components that could potentially cause negative side effects." That statement was false and misleading. Sanders and Shaman Botanicals knew that Advanced Alkaloids *increased* and concentrated one "plant component" (which was intended to refer to the kratom plant), specifically, 7OH, which was known to Sanders and Shaman Botanicals to create a significant risk of dependence and addiction with resulting negative side effects in the form of painful and uncomfortable withdrawal symptoms.

71. Fourth, also in the "Legal and Safety Information" section of the promotional website for Advanced Alkaloids as of June 15, 2024, Sanders and Shaman Botanicals directed that it state the following: "Although there aren't studies conclusively showing addiction related to alkaloids, there are anecdotal reports of people developing an addiction to alkaloid products. If you feel you are developing an addiction to this or any product, consult a physician or an addiction center

21

immediately." This statement was false and misleading in several respects. It implied the absence of any studies showing "addiction related to alkaloids," which was false. By using "alkaloids" generically, which was used in the name "Advanced Alkaloids," the statement implied a relevance and connection to the Advanced Alkaloids product that did not exist. The statement omitted a material fact that neither CBD American Shaman nor Shaman Botanicals nor anyone else had performed any clinical studies on the safety, effectiveness, or addictiveness of the Advanced Alkaloids products or the 7OH concentrated ingredient that it used. Instead, the statement implies that such studies may have been done, but their results were not "conclusive," which was intended to provide reassurance to customers who may have been concerned about dependence or addiction and to downplay the risks of such outcomes.

72. Nowhere in any sales or marketing information connected with the sales of Advanced Alkaloids through CBD American Shaman, or the sales of any other 7OH containing products wholesale to other retailers, has Sanders or Shaman Botanicals provided any specific warnings or disclosures that their 7OH concentrate was specially manufactured to be a highly concentrated and potent form of 7OH, not found in the kratom plant, and which carries with it a unique and increased risk of dependency, addiction, and resulting negative withdrawal symptoms.

73.     Even as Sanders and Shaman Botanicals have directed that CBD American Shaman use slightly more specific warning language about the possibility of dependence and addiction in more recent versions of the website marketing for Advanced Alkaloids, the warnings and information provided continues to be misleading, deceptive, incomplete, and the net impression continues to downplay both the likelihood and potential consequences of addiction or dependence to Advanced Alkaloids.  The marketing communications continue to fraudulently induce purchasers into believing Advanced Alkaloids are safer to use than they are known by Sanders and Shaman Botanicals to be.

74.     Further, Sanders and Shaman Botanicals had final authority over and directed the messaging and marketing that CBD American Shaman stores were to use in selling Advanced Alkaloids, and directed to employees and franchisees that the benefits of the product be emphasized, and that the negatives of the product including addictiveness, dependence, and withdrawal symptoms be minimized or not disclosed.

75.     Sanders and Shaman Botanicals also directed that the marketing of Advanced Alkaloids should tie the product to kratom in several ways, which were false and misleading and attempts to piggyback the new product onto pre-existing and milder kratom products in order to reassure customers and to induce them to try Advanced Alkaloids.

76.     First, when introducing the product, CBD American Shaman website information explicitly linked the new Advanced Alkaloid product to kratom, including in a section with the heading, "What is Kratom?" The brief discussion of kratom discusses only positive effects of kratom ("stimulant," "discomfort relief," "mood-enhancing" and "discomfort-reducing") without any discussion of known side effects or addictiveness of kratom.

77.     But more deceptively, the website information uses vague and positive language ("powerful") to describe the 7OH alkaloid found in kratom, but fails to explain that the 7OH alkaloid is found in only very small quantities in kratom, whereas the 7OH in Advanced Alkaloids was highly concentrated, existed in a much greater quantity in Advanced Alkaloids than in kratom, and was known to be far more potent, and addictive, than kratom.

78.     Sanders and Shaman Botanicals further directed that Advanced Alkaloids be marketed with additional fraudulent and deceptive links to kratom products by introducing different versions of Advanced Alkaloids with names distinguishing different color veins ("white vein," "green vein," "red vein"). These product names and identifiers were intentionally deceptive and misleading because they again suggested more of a link between Advanced Alkaloids and pre-existing kratom products than actually existed, and piggybacked on the reputations and user

24

experiences customers may have had with pre-existing kratom products that were composed entirely differently and contained far less 7OH than Advanced Alkaloids.

79.     Sanders and Shaman Botanicals furthered their scheme to defraud by encouraging or directing CBD American Shaman stores to aggressively promote Advanced Alkaloids products, including by giving away free samples to customers or offering substantial discounts to encourage first-time users to try Advanced Alkaloids, without disclosing to such customers the known risks of addiction and dependency.

80.     Sanders and Shaman Botanicals also furthered their scheme to defraud by misrepresenting or omitting material facts in communications to consumers about the legality or regulatory status of Advanced Alkaloids and other 7OH containing products.  In the initial introductory communications to consumers and the public about Advanced Alkaloids that Sanders and Shaman Botanicals directed by included on the CBD American Shaman website, in the "Legal and Safety Information" section, the following highly misleading statement was the only statement addressing the legality of the product: "Kratom is legal in every state except Alabama, Arkansas, Indiana, Rhode Island, Vermont, and Wisconsin. Consumers should consult state and local laws before purchasing or consuming any kratom product."  That statement was highly misleading and omitted the material facts distinguishing the Advanced Alkaloids' 7OH products from "kratom products" and

again sought to deceptively link Advanced Alkaloids to "kratom" without disclosing the material differences in potency and risks of dependence and addiction.

81.     Sanders and Shaman Botanicals sought to reassure concerned customers or purchasers about the legality of Advanced Alkaloids by providing a vague and not necessarily relevant statement about the alleged legality of "kratom." Such statements were intended to induce customers to purchase Advanced Alkaloids by building trust through suggesting that such products had sponsorship, legality, or approval that the products did not have.

82.     Sanders and Shaman Botanicals have also furthered their scheme to defraud and extended it to other 7OH products that Shaman Botanicals has manufactured and sold at wholesale to other retailers under "white label" brands or other brand names. Sanders and Shaman Botanicals have directed that there not be any stronger, more specific, or more accurate disclosures about the risks of addiction, dependency, or the severity of withdrawal symptoms provided for such "white label" 7OH products to other purchasers. Also, they have directed that the packaging of their other 7OH products sold through "white label" or third party retailers not identify Shaman Botanicals or any other Shaman entity as the source of the products, making it more difficult for regulators or claimants to trace or track the origins of such products.

83.     In sum, when Sanders and Shaman Botanicals came to market with their chewable "Advanced Alkaloids" tablets in early 2024 that they offered for sale through CBD American Shaman retail outlets, they touted the supposed benefits of the products while downplaying or denying any risk of dependence or addiction from such products, thus creating a false and misleading overall impression of the products to purchasers. They drew a misleading connection between the 7OH products and the kratom plant, concealing the specifics of how they were being made, in order to induce customers to positively associate the 7OH products with pre-existing kratom products. They also directed store managers and employees of both company-owned and franchised stores to aggressively promote Advanced Alkaloids, including giving away free samples, to foment addiction among customers and generate substantial repeat purchases.

84.     Sanders and Shaman Botanicals were aided and abetted in their scheme to defraud consumers and purchasers of Advanced Alkaloids and other 7OH containing products by other persons and entities whose identities will become known through discovery.

**D. The Scope and Consequences of the 7OH Scheme.**

85.     The 7OH scheme directed and carried out by Sanders and Shaman Botanicals has proven to be wildly profitable, at the expense of consumers.

86.     Sanders has boastfully suggested that sales of 7OH products by Shaman Botanicals and the CBD American Shaman enterprise substantially exceed $100 million per year.

87.     Sales of 7OH products have occurred both as Advanced Alkaloids through CBD American Shaman stores, including additional "veins" and varieties that have been introduced since the first products debuted in the first half of 2024, and also as "white label" or other-branded products that have been manufactured by Shaman Botanicals and sold at wholesale to other, non-CBD American Shaman retailers, for resale to consumers.

88.     All of those sales escalated quickly. Within a short time of introducing the first Advanced Alkaloids products through CBD American Shaman stores in the first half of 2024, some stores had total revenues from sales of Advanced Alkaloids that surpassed total revenues from some stores' sales of all other products combined.

89.     For struggling CBD American Shaman stores, the introduction and sales of Advanced Alkaloids has been a lifeline.  But it has come at the expense of deceived consumers who have been misled about the product they are purchasing, and who have been financially as well as, in some case, physically and emotionally injured by the scheme, many of whom find themselves trapped in a cycle of withdrawals that is painful, sometimes debilitating, sometimes embarrassing, and always expensive.  Even purchasers who manage to avoid addiction and withdrawal

find themselves paying premium prices that exceed what retailers could charge for such products if they were made with full, fair and truthful disclosures.

90.     Advanced Alkaloids are expensive.  A pack of two tablets sells for $9.99 at retail, while a 10-pack sells for around $30.  A bottle of 30 tablets sells for $99.

91.     Plaintiffs, and other customers, report that soon after starting to purchase and take Advanced Alkaloids, they have found themselves developing tolerance, dependence, increasing their doses, and experiencing withdrawal symptoms.  Many customers, within a month or two of taking their first 7OH tablets, spend several hundreds of dollars or more per month on Advanced Alkaloids, much of which is spent on products while trying to alleviate symptoms of withdrawal.

92.     Sanders and Shaman Botanicals have continued to aggressively promote, market and sell 7OH products, without correcting their false and misleading statements and omissions about the products, because the profits from such sales are extraordinary.

## V. CLASS ALLEGATIONS

93.     Plaintiffs bring this class action individually, and, as representatives of Classes on behalf of all similarly situated individuals pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, as follows:

94.     All Plaintiffs seek to represent a Nationwide Class as follows:

## Nationwide Class

All United States residents who have (1) purchased one or more Advanced Alkaloids products, or other 7OH-containing products, from a CBD American Shaman retail store, and who have not purchased any such products from CBD American Shaman online; and/or (2) purchased one or more 7OH-containing products manufactured by and sold at wholesale by Shaman Botanicals, and which were purchased from a retailer other than a CBD American Shaman retail store.

95.     As an alternative or in addition to the Nationwide Class, Plaintiff Ray seeks to represent a Missouri Subclass based upon the applicable laws set forth in the alternate state law counts.  The Missouri Subclass is defined as follows:

## Missouri Subclass

All Missouri residents who have (1) purchased one or more Advanced Alkaloids products, or other 7OH-containing products, from a CBD American Shaman retail store, and who have not purchased any such products from CBD American Shaman online; and/or (2) purchased one or more 7OH-containing products manufactured by and sold at wholesale by Shaman Botanicals, and which were purchased from a retailer other than a CBD American Shaman retail store.

96.     As an alternative or in addition to the Nationwide Class, Plaintiff Korte seeks to represent a Kansas Subclass based upon the applicable laws set forth in the alternate state law counts.  The Kansas Subclass is defined as follows:

## Kansas Subclass

All Kansas residents who have (1) purchased one or more Advanced Alkaloids products, or other 7OH-containing products, from a CBD American Shaman retail store, and who have not purchased any such products from CBD American Shaman online; and/or (2) purchased one or more 7OH-containing products manufactured by and sold at wholesale by Shaman Botanicals, and which were purchased from a retailer other than a CBD American Shaman retail store.

97.    Collectively, the Class, Missouri Subclass, and Kansas Subclass are referred to as the "Classes" or "Class Members."

98.    Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

99.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

100.    The members of the Classes are so numerous that joinder of all members is impracticable. Each Class and Subclass at least thousands of members. Members of the Classes are widely dispersed throughout the country and/or each respective state.

101.    Typicality: Plaintiffs' claims are typical of the claims of all class members.  Plaintiffs' claims arise from the same course of conduct that gives rise to the claims of other class members.  Plaintiffs and all class members have been and would continue to be damaged by the same wrongful conduct – i.e., certain Defendants' scheme to engage in fraudulent and unfair business practices regarding

the manufacturing, marketing, and sale of Advanced Alkaloids and other 7OH containing products.

102. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members.

103. Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action and consumer protection litigation, and cases involving RICO claims against manufacturers and sellers of highly addictive products.

104. Questions of law and fact common to the classes include:

   a. Whether certain Defendants knew that 7OH was a highly addictive substance and that Advanced Alkaloids were highly addictive products;

   b. Whether certain Defendants manufactured Advanced Alkaloids and other 7OH containing products to be highly addictive to users;

   c. Whether certain Defendants engaged in a scheme to defraud customers by intentionally misrepresenting Advanced Alkaloids and 7OH as safe, not addictive, not highly addictive, or by otherwise downplaying or failing to disclose the known risks of Advanced Alkaloids and 7OH to customers in order to induce them to purchase such products;

   d. Whether the advertising, marketing, and labeling for Advanced Alkaloids and other 7OH containing products was misleading, fraudulent, deceptive, unfair and/or unconscionable;

e. Whether Defendants' conducted an enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.;*

f. Whether Defendants have been unjustly enriched through the false, misleading and deceptive sales of Advanced Alkaloids and other 7OH containing products;

g. Whether Advanced Alkaloids and other 7OH containing products were in merchantable condition when sold, were defective when sold, or possessed the most basic fitness for ordinary use;

h. Whether Defendants' conduct violated the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

i. The amount of damages owed the classes;

j. The appropriate measure of disgorgement;

k. The type and format of injunctive relief.

105. Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

106. Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might

33

not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

107.   Class treatment is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this case.

108.   Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

109.   Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, conduct, products, and duties.

110.   Unless a Class-wide injunction is issued, Defendants may continue to act unlawfully as set forth in this Complaint.

## VI. CAUSES OF ACTION

### COUNT 1: RICO
### Violation of 18 U.S.C. § 1962(c)
### (*On behalf of Plaintiffs and the Nationwide Class against Sanders, SVS,* *Shaman Botanicals, and John Does 1-10*)

111.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

112.   This claim is brought by Plaintiffs against Defendants Sanders, SVS, Shaman Botanicals, and John Does 1-10 (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*  This claim is not brought against CBD American

34

Shaman, LLC, as that entity is alleged to be the enterprise through which the RICO Defendants have carried out their violations of the RICO Act.

113.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

114.   At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

115.   Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

116.   Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

117.   Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

35

118.   CBD American Shaman is a limited liability company and therefore meets the definition of "enterprise" under the RICO Act.   Specifically, CBD American Shaman is registered as a limited liability company in the State of Missouri.

119.   Each of the RICO Defendants – Sanders, SVS, Shaman Botanicalsand John Does 1-10 – managed, directed, and controlled the CBD American Shaman Enterprise.  That is, they used CDB American Shaman as the vehicle through which an unlawful pattern of racketeering activity was committed, through Sanders' role as an officer and managing director of CBD American Shaman, and through the actions of various affiliated entities and as-yet unnamed individuals who were able to control the resources and instrumentalities of CBD American Shaman, and control the product characteristics of the Advanced Alkaloids and 7OH containing products sold through CBD American Shaman retail stores.

120.   Sanders has created multiple entities, including other RICO Defendants SVS and Shaman Botanicals.   Sanders has personally acted in managing and directing the affairs of CBD American Shaman LLC, and, he has acted through these additional entities he created to manage and direct CBD American Shaman, LLC as the enterprise through which the RICO Defendants have acted in carrying out the scheme to defraud consumers.

36

121.    The RICO Defendants were able to use their control of CBD American Shaman and its product inventory to perpetrate a fraudulent scheme that involved used of mail and wires.    The fraudulent scheme included sales of Advanced Alkaloids and other 7OH containing products to consumers while fraudulently misrepresenting or omitting the truth about those products – that they were known to RICO Defendants to be dangerously and highly addictive, and that they were not naturally derived or produced from the kratom plant but, rather, they were synthetically and chemically made to concentrate 7OH at levels far exceeding what exists in any natural kratom product.

122.    The RICO Defendants knew that they could turn around the declining sales of CBD American Shaman and that they each stood to receive a massive payoff if they could create highly addictive 7OH containing products, market the products as safe and non-addictive, downplay any risks that the products were addictive or habit forming, offer samples of the product for free or at drastically reduced introductory prices to unsuspecting customers without disclosing the risks or the addictive nature of the products, and then reap the rewards of customers who quickly felt compelled to spend hundreds or even thousands of dollars per month on the products to avoid the painful withdrawal symptoms that accompanied any decrease or cessation in the use of the products.

123. The RICO Defendants transmitted messages over the mail and wires to customers and prospective customers, to CBD American Shaman, to each other, and to federal government in furtherance of their scheme to defraud customers of CBD American Shaman and purchasers of Advanced Alkaloids and other 7OH containing products.

124. CBD American Shaman is an enterprise that is engaged in and affects interstate commerce because the company has sold and continues to sell products across the United States, as alleged herein.

125. As described herein, each RICO Defendant participated in the operation or management of the CDB American Shaman Enterprise, and directed the affairs of the CDB American Shaman Enterprise through a pattern of racketeering activity, including masterminding schemes to defraud that were carried out by and through CBD American Shaman using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

126. Alternatively, the RICO Defendants, along with CBD American Shaman and John Does 1-10, formed an association in fact enterprise that, while not a legal entity, acted collectively as an enterprise to carry out the schemes to defraud alleged herein and fraudulently and deceptively manufacture and sell Advanced Alkaloids and 7OH in order to generate unjust profits fueled by customers' addictions.

38

127.   As described above, Sanders was the visionary behind CBD American Shaman, and he was also the visionary behind the plan for developing highly addictive 7OH containing products, like Advanced Alkaloids, and manufacturing them using Shaman Botanicals, and then marketing and selling them through CBD American Shaman as safe and non-addictive, concealing that they had actually been made intentionally to be highly addictive, synthetic opioids.

128.   Shaman Botanicals is an entity which, upon information and belief, is controlled and managed by Sanders and other business executives and has performed product research, development, testing, and manufacturing of the 7OH containing products, including Advanced Alkaloids, that are sold to CBD American Shaman stores and other retailers for sale to the general public.

129.   Sanders uses multiple entities to obscure and conceal the roles and actions of himself and his close business associates, in order to discourage or complicate efforts to regulate or bring litigation against Sanders or the entities that he owns and controls.

130.   Other individuals and entities yet to be named, whose identities will be learned through discovery, played direct and key roles in the design and development of Advanced Alkaloids and other 7OH containing products and knew, like Sanders, that such products were highly and dangerously addictive, and

participated in the scheme to conceal and downplay that characteristic in those products when marketing and selling them to customers of CBD American Shaman.

131. In addition to sales of 7OH containing products through CBD American Shaman, the RICO Defendants have also engaged in the same fraudulent conduct in manufacturing and selling similar 7OH containing products at wholesale, which are sold to various vape shops, gas stations, and other retailers, and, in turn, sold to consumers through those stores. The RICO Defendants, similarly, have intentionally concealed the highly and dangerously addictive characteristics of their products to their wholesale purchasers and to the consuming public of those sales, all to generate repeated sales at high prices and generate excessive profits based on addiction.

132. The operation of the CBD American Shaman enterprise, as directed by the RICO Defendants, included several schemes to defraud that furthered the goals of the RICO Defendants – to create and expand the market for expensive, profitable, 7OH-containing products, by generating demand for repeat business flowing from addiction, and for CBD American Shaman to regain market share and revenues it was losing in the THC market as a result of the trend toward THC legalization and expansion of retailers selling THC.

133. The RICO Defendants engaged in a fraudulent manufacturing scheme, through which they engaged in secret research, development, and testing – protected

both by promises of secrecy and through the use of non-disclosure agreements that they required employees to sign – in order to develop a form of 7OH concentrate, which is far more potent and concentrated than any 7OH naturally found in the kratom plant. The RICO Defendants then took their 7OH concentrate and combined it with other inputs to create chewable tablets called Advanced Alkaloids, or combined it with other inputs to market or distribute in other forms, including liquids. As part of this scheme, the RICO Defendants committed and concealed numerous violations of state and federal occupational and environmental safety regulations, including by testing their products on humans without disclosing the risks of participating in the testing, using hazardous materials in the workplace without proper safety measures or disclosures, and failing to seek the required approvals from the federal government before selling their final products to the general public.

134. The RICO Defendants also engaged in a fraudulent marketing scheme, through which they marketed and sold their 7OH containing products, including Advanced Alkaloids, without obtaining proper legal and regulatory approvals, and through false and fraudulent misrepresentations and omissions about the products on company websites, on product packaging, and through store employees who had been trained and what to say and what not to say about the products to customers.

135.    The RICO Defendants sold Advanced Alkaloids through the CBD American Shaman network of company-owned and franchised retail stores, and directed that those store employees should prioritize and emphasize the 7OH containing products to customers.    The RICO Defendants directed that CBD American Shaman stores should offer free samples to first-time users, or offer substantial discounts on first purchases to induce people to try Advanced Alkaloids, without disclosing to the customers that the products were known to be – and had been made to be – highly and dangerously addictive, without disclosing that that they were known to be and were made to be, essentially, a synthetic opioid; and without disclosing to customers what withdrawal symptoms of an addiction to the 7OH containing products might include.

136.    As part of the fraudulent marketing scheme, the RICO Defendants also sold 7OH containing products under "white label" or other brand names at wholesale to other retailers, including vape shops, head shops, and gas stations, all without disclosing to those retailers the true content and characteristics of those products, or that such products lacked the required regulatory approvals to be sold. The RICO Defendants misrepresented the content of 7OH in their products, affirmatively and/or by omissions in the product packaging and information provided to retailers purchasing the products at wholesale, and failed to disclose to retailers that the

42

products were made to be highly and dangerously addictive, in order to drive repeat sales.

137.   The RICO Defendants did willfully or knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

138.   Specifically, the RICO Defendants – individually and collectively – have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and  1343), within the past ten years.

139.   The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

140.   The RICO Defendants used, directed the use of, and/or caused to be used, multitudes of interstate mail and wire communications in service of the Enterprise's objectives, through common misrepresentations, concealments, and material omissions.

141. As described herein, the RICO Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public and deceive regulators by, among other things: (1) transmitting advertising and promotional content that fraudulently and deceptively misrepresented or concealed the true potency, addictiveness, or risk of addiction to Advanced Alkaloids and 7OH content; (2) transmitting advertising and promotional content that portrayed Advanced Alkaloids and 7OH as safe, non-addictive, and a superior and safer alternative to other products including other opioids; (3) transmitting advertising and promotional content deceptively linking Advanced Alkaloids and 7OH containing products to kratom, without disclosing that the products actually contained a highly concentrated, synthesized form of 7OH that they had developed through chemical manipulation resulting in 7OH levels far exceeding what is found in kratom or other kratom-derived products; (4) representing to retail and wholesale customers that the sale of Advanced Alkaloids and other 7OH containing products was legal, despite having failed to seek the required regulatory approvals from the federal government in order to lawfully sell such products.

142. The RICO Defendants committed these racketeering acts intentionally and knowingly, with the specific intent to defraud and to personally or directly profit from those actions.

143. The RICO Defendants intended Plaintiffs, members of the Nationwide Class, wholesale purchasers, regulators, and the public to rely on their false and deceptive misrepresentations and omissions. Thus, their scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension.

144. Each Plaintiff and all members of the Nationwide Class were directly injured by the RICO Defendants' conduct. Such injuries would not have occurred but for the predicate acts and wrongful conduct of the RICO Defendants. As a result of the RICO Defendants' scheme to defraud, Plaintiffs and RICO Class members were induced to purchase Advanced Alkaloids and other 7OH containing products that they would not have purchased, or, paid more for such products than they would have paid, if they had known about the intentionally increased addictiveness of the products and the painful withdrawal symptoms that are associated with use of the products. Plaintiffs and the RICO Class members were also induced to purchase Advanced Alkaloids and other 7OH containing products because of the express and implied representations made to them under the direction of the RICO Defendants that such products were legal and that CBD American Shaman and other retailers were lawfully authorized to sell them.

145. Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

## COUNT 2: RICO
## Violations of 18 U.S.C. § 1962(d)
### (*On behalf of Plaintiffs and the Nationwide Class*)

146.    Plaintiffs incorporates by reference the factual allegations contained in the preceding paragraphs of this complaint.

147.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  28 U.S.C. § 1962(d).

148.    The RICO Defendants have undertaken the practices described herein as part of a common scheme and conspiracy.  The conspiracy began at the first point in time, upon information and belief in or around 2022, when RICO Defendants conceived of the plan to manufacture a concentrated and highly addictive form of 7OH concentrate to use in making Advanced Alkaloids and other 7OH containing products, and to use CBD American Shaman stores to deceptively sell Advanced Alkaloids, and to deceptively sell to other retail stores "white label" versions of similarly addictive 7OH products.   Certain RICO Defendants have joined the conspiracy at different times. The conspiracy continues to this day.

149.    The acts in furtherance of the conspiracy attributable to the RICO Defendants include each of the predicate acts underlying their use of the CBD American Shaman enterprise to directly or indirectly engage in a pattern of racketeering activity in violation of Section 1962(c), as described above.  Various other persons, firms, and corporations, including third-party entities and individuals

46

not named as Defendants in this Complaint have participated as co-conspirators with the members of the enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue from sales of Advanced Alkaloids and other 7OH containing products. Where a RICO Defendant did not commit a predicate act itself, it agreed to the commission of the predicate act.

150. Each Plaintiff and all members of the Nationwide Class were directly injured by reason of the RICO violations, and such injury would not have occurred but for the predicate acts of the RICO Defendants, which also constitute the acts taken by RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d).

151. The RICO Defendants' actions in furtherance of their conspiracy induced Plaintiffs and the Nationwide Class to purchase Advanced Alkaloids and other 7OH containing products that they would not have purchased, or, alternatively, to pay more for such products than they would have paid, had they known of the true nature, content and characteristics of such products, including that they were intentionally made to be highly addictive and carried the risk of severe withdrawal symptoms, as bad or worse than opioids like heroin. Plaintiffs and the Nationwide Class were also induced to purchase Advanced Alkaloids and other 7OH containing products sold fraudulently sold through the RICO Defendants' enterprise by virtue

of RICO Defendants' false representations, expressly and implicitly, that such products were legal and that they were being lawfully marketed and sold through brick-and-mortar retail stores, when in fact such products were not being lawfully marketed and sold and should not have been available for Plaintiffs and the Nationwide Class to purchase without regulatory approval from the federal government.

152.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Act violations in furtherance of the RICO Defendants' conspiracy and Plaintiffs and the Nationwide Class members' injuries.  The RICO Defendants made false and misleading statements directly to the public about Advanced Alkaloids and other 7OH containing products.

153.    Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

## COUNT 3: KCPA
## Violations of Kan. Stat. Ann. § 50-623 *et seq.*
### (*On behalf of Plaintiff Korte and the Kansas Subclass against all Defendants*)

154.   Plaintiffs incorporate the factual allegations above as if fully set forth herein.

155.   This claim is brought against all Defendants except SVS.

156.   Defendants are "suppliers" as defined by the Kansas Consumer Protection Act. Kan. Stat. Ann. § 50-624(l).

157.   Plaintiffs Korte and Ray and members of the Kansas Subclass are individuals who purchased for personal purposes Advanced Alkaloids and other 7OH containing products manufactured, marketed and sold by Defendants.

158.   Defendants engaged in deceptive acts and practices in connection with consumer transactions in violation of the Act by making representations, knowingly or with reason to know, that Advanced Alkaloids and their other 7OH containing products had approval, characteristics, ingredients, uses, or benefits that they did not have, including by:

   a.   Expressly and implicitly representing that such products were being lawfully marketed, when they were not because they did not have the required approval from the federal government;

   b.   Expressly representing that such products were safe, when they were not;

c. Expressly representing that such products were not addictive, when they were intentionally made to be highly addictive; and

d. Expressly representing that such products were related to kratom, when in fact they had been engineered and formulated to be received by the human body as a powerful and potent opioid;

159.   Defendants' conduct as described herein also violated the Act by the willful use in oral or written representations of exaggeration, falsehoods, innuendo or ambiguity as to a material fact, by the willful failure to state a material fact and/or by the willful concealment, suppression or omission of a material fact.

160.   Advertisements and representations about Advanced Alkaloids and other 7OH products contained deceptive statements and portrayed such products as safe or not harmful.  They also concealed and failed to disclose that such products were essentially extremely potent opioids, were powerfully addictive, were made with a concentrated form of 7OH not found naturally in the kratom plant, and posed a serious risk of substantial injury, addiction, and painful withdrawal symptoms from a short period of use of such products.

161. Defendants' conduct was unfair and unconscionable in that it included the intentional manufacture and sale of products with a heightened propensity to cause addiction and resulting physical and economic injuries, combined with concealment of those facts from consumers who were expected to be ignorant of that fact, and who would rely on Defendants' false representations and assurances about the products to their detriment.

162. Defendants' conduct actually and proximately caused damage to Plaintiffs Korte, Ray, and members of the Kansas Subclass. Plaintiffs and Kansas Subclass members would have behaved differently and would not have purchased Defendants' Advanced Alkaloids and other 7OH containing products, or would have paid less for them, but for Defendants' misrepresentations, omissions, deceptive practices and unconscionable conduct in violation of the Act.

163. Plaintiffs Korte, Ray and members of the Kansas Subclass demand the applicable relief set forth in the Prayer for Relief below.

### COUNT 4: MMPA

**Violations of Mo. Rev. Stat. § 407.020 *et seq.***
**(*On behalf of Plaintiff Ray and the Missouri Subclass against all Defendants*)**

164. Plaintiffs incorporate the factual allegations above as if fully set forth herein.

165. Defendants are "persons" as defined by the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010(5).

166.   Advanced Alkaloids and other 7OH containing products made and sold by Defendants are "merchandise" as defined by the MMPA, Mo. Rev. Stat. § 407.010(4).

167.   Plaintiff Ray and members of the Missouri Subclass are individuals who purchased for personal purposes Advanced Alkaloids and other 7OH containing products manufactured, marketed and sold by Defendants.

168.   As alleged herein, Defendants engaged in deceptive acts and used or employed deception, fraud, false pretense, misrepresentation, unfair practice or the concealment, suppression, or omission of material facts in connection with the sale and advertisement of Advanced Alkaloids and other 7OH containing products, in violation of the MMPA, Mo. Rev. Stat. § 407.020.1

169.   Plaintiff Ray and members of the Missouri Subclass suffered an ascertainable loss of money or property as a result of the Defendants' deceptive acts, omissions, and unfair practices in connection with the sale of Advanced Alkaloids and other 7OH containing products in violation of the MMPA.  Specifically, Plaintiff Ray and members of the Missouri Subclass would not have purchased such products, or would have paid less for them, but for the acts and practices of Defendants in violation of the MMPA.

170.   The unlawful methods, acts and practices of Defendants caused similar injury to numerous other persons in addition to Plaintiff Ray.

171. Plaintiff Ray, along with members of the Missouri Subclass, acted as a reasonable consumer would in light of all circumstances in making his purchases of Advanced Alkaloids from Defendants.

172. The methods, acts, or practices of Defendants that were unlawful under the MMPA would cause a reasonable person to enter into the transactions that resulted in damages.

173. Plaintiff Ray can establish his individual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty.

174. Among other things, Defendants violated the MMPA by making representations, knowingly or with reason to know, that Advanced Alkaloids and their other 7OH containing products had approval, characteristics, ingredients, uses, or benefits that they did not have, including by:

    e. Expressly and implicitly representing that such products were being lawfully marketed, when they were not because they did not have the required approval from the federal government;

    f. Expressly representing that such products were safe, when they were not;

    g. Expressly representing that such products were not addictive, when they were intentionally made to be highly addictive; and

175.   Expressly representing that such products were related to kratom, when instead they had been engineered and formulated to be received by the human body as a powerful and potent opioid;

176.   Defendants' conduct as described herein also violated the MMPA by the willful failure to state a material fact and/or by the willful concealment, suppression or omission of a material fact about the Advanced Alkaloids and other 7OH containing products. Advertisements and representations about Advanced Alkaloids and other 7OH products contained deceptive statements and portrayed such products as safe or not harmful.  They also concealed and failed to disclose that such products were essentially extremely potent opioids, were powerfully addictive, were made with a concentrated form of 7OH not found naturally in the kratom plant, and posed a serious risk of substantial injury, addiction, and painful withdrawal symptoms from a short period of use of such products.

177.   Defendants' conduct was unfair and unconscionable in that it included the intentional manufacture and sale of products with a heightened propensity to cause addiction and resulting physical and economic injuries, combined with concealment of those facts from consumers who were expected to be ignorant of that fact, and who would rely on Defendants' false representations and assurances about the products to their detriment.

178. Plaintiff Ray and members of the Missouri Subclass demand the applicable relief set forth in the Prayer for Relief below.

## COUNT 4: UNJUST ERICHMENT
### (*On behalf of Plaintiffs and the Nationwide Class against all Defendants*)

179. Plaintiffs incorporate the factual allegations above as if fully set forth herein.

180. Defendants created an implemented a scheme to create and exploit a market for deceptively and highly addictive 7OH containing products, such as Advanced Alkaloids through a deliberate pattern and practice of false and misleading statements and material omissions of material facts. Defendants aimed to portray Advanced Alkaloids and other 7OH containing products as safe, not harmful, and superior alternatives to opioids or other forms of pain relief, while misrepresenting or omitting key facts concerning the origin and concentration of such products' 7OH content, their addictiveness, and the significant risks of injurious and painful withdrawal symptoms arising from a minimal amount of use of such products.

181. Defendants were unjustly enriched as a result of their wrongful conduct, which included false and misleading representations, advertisements, and omissions concerning the products that induced Plaintiffs into making purchases they would not have made, or paying more than they would have paid, for such products absent Defendants' wrongful conduct.

182.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and Class members in the form of their payments for Advanced Alkaloids and other 7OH containing products.

183.   Defendants appreciated, recognized, and chose to accept the monetary benefits conferred to them by Plaintiffs and to Plaintiffs' detriment.  These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

184.   There is no justification for Defendants' enrichment.   It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

185.   Plaintiffs are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

186.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## **RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS**

187.   None of the causes of action asserted herein seeks damages as a result of personal injuries to Plaintiffs and other class members' use of Advanced Alkaloids and other 7OH containing products.  Such claims may be the subject of

other complaints that may be filed by class members. The named Plaintiffs in this complaint expressly reserve their right to seek damages or other relief for personal injuries they may have suffered, regardless of whether those damages are sought through causes of action alleged herein or otherwise.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed classes, respectfully demand that the Court:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), direct that reasonable notice of this action be given to the classes, declare Plaintiffs and named representatives of the classes, and declare that Plaintiffs' counsel be appointed as class counsel;

B. Enter judgment against Defendants and in favor of Plaintiffs in the classes;

C. Award damages (including statutory, punitive, and treble damages as provided by law) and restitution to the classes in an amount to be determined at trial, plus interest in accordance with law;

D. Order disgorgement from the Defendants;

E. Award Plaintiffs and the classes their costs of suit, including reasonable attorneys' fees as provided by law;

F. Award such further and additional relief as is necessary to redress the harm caused by Defendants' unlawful conduct and as the Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: September 18, 2025

Respectfully Submitted,

*/s/ Eric D. Barton*
Thomas P. Cartmell   MO Bar #45366
Eric D. Barton        MO Bar #53619
Karen Fritts          MO Bar #74995
Wagstaff & Cartmell LLP
4740 Grand Ave., Ste. 300
Kansas City, MO 64112
Telephone:  816-701-1100
Fax:  816-531-2372
tcartmell@wcllp.com
ebarton@wcllp.com
thudson@wcllp.com